NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARK BEALS, | ) | |
| | ) | Supreme Court No. S-15632 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-12700 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| PATRICIA BEALS, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1535 – March 25, 2015 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Kara A. Nyquist, Anchorage, for Appellant. Jacob A. Sonneborn, Ashburn & Mason, P.C., Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Stowers, Justice, not participating.]

I.    INTRODUCTION

Divorced parents living in Seward shared legal and equal physical custody of their two children. The mother wished to relocate to Anchorage for employment-related reasons and moved to modify the physical custody arrangement so the children could move with her to Anchorage. The superior court found the proposed move was for a legitimate purpose, and, after making findings on relevant custody factors and

---

[*]    Entered under Alaska Appellate Rule 214.

weighing those factors, ruled that the children could move to Anchorage with the mother. The father appeals, arguing the court clearly erred in finding the move was for a legitimate purpose and in its custody factor findings, thereby abusing its discretion in the ultimate custody decision. We affirm the court's decision in all respects.

## II. FACTS AND PROCEEDINGS

Patricia (Patty) and Mark Beals married in 1999 in Seward and had two sons, one born in 2001 and one born in 2008. Patty and Mark separated in November 2008, soon after their second son's birth. In subsequent divorce proceedings the parties agreed to equal shared physical custody in Seward.

In October 2013 Patty filed a motion to modify custody, stating that she "recently left her job in Seward and plans to relocate to Anchorage." She asserted that her move was a substantial change in circumstances because "[a] move of considerable distance, by a parent who has significant custodial time with the children, may be a substantial change in circumstances. The current custody order in this case simply cannot work with the parties living in communities approximately 125 miles apart." She asked the court to "determine the best interests of the children given [her] intent to relocate." The superior court granted a hearing, and Mark and Patty both testified at the hearing, as did other extended family members, friends, and co-workers.

The superior court found that the proposed move was legitimate and "not designed to separate the children from the defendant, their father, but to pursue new career opportunities." Turning to the best interests of the child factors,[1] the court found that the majority of the factors favored neither parent. The neutral factors included: the "physical, emotional, mental, religious, and social needs of the child[ren]," the "child[ren]'s preference," the "love and affection existing between the child[ren] and

---

[1] *See* AS 25.24.150(c) (listing nine factors courts shall consider).

each parent," and the "length of time the child[ren] ha[ve] lived in a stable, satisfactory environment." The court also noted that there was no evidence of domestic violence or substance abuse.

But the court found that three of the factors were not neutral. First, the court found that the "capability and desire of each parent to meet [the children's] needs" weighed in Patty's favor because she was the one who consistently took care of the smaller details in the boys' lives: "It is not that the father is not capable of performing those tasks, he just doesn't do them when he has the opportunity." Second, the court found that "[t]he desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent" favored Patty as well. The court stated that the "[m]other has been very supportive of the father's relationship with the children," and that she "testified credibly and the court has developed confidence in her that she will not abuse any discretion given to her." In contrast, the court noted testimony that Mark had disparaged Patty in front of the children on several occasions. Finally, the court found that "other factors that the court considers pertinent" favored Mark, specifically that "the boys have a very solid and supportive group of friends and family within Seward," and "[m]aintaining those connections will be very important." The superior court ruled that both legal and physical custody would continue to be shared, but that the boys should move to Anchorage with their mother, visiting Mark in Seward every other weekend, the majority of summer vacations, and half of shorter school vacations.

Mark appeals, arguing that: (1) the move was illegitimate; (2) Patty was not the parent more able to meet the children's needs or "allow an open and loving frequent relationship"; (3) the stability and continuity factor should have favored him instead of being neutral; and, therefore, it was an abuse of discretion to allow Patty to take the children to Anchorage.

## III. STANDARD OF REVIEW

"The trial court has broad discretion in child custody decisions."[2] We reverse a custody decision only when "the record shows an abuse of discretion or if controlling factual findings are clearly erroneous."[3] An abuse of discretion exists when the court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[4] "A factual finding is clearly erroneous when a review of the record leaves the court with a definite and firm conviction that the [trial] court has made a mistake."[5] "The trial court's factual findings enjoy particular deference when they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[6]

## IV. DISCUSSION

### A. Legitimacy Of The Move

In his opening brief Mark argues that the move was illegitimate and that it should have been taken into account during the best interests analysis. For example, as

---

[2]    *Veselsky v. Veselsky*, 113 P.3d 629, 632 (Alaska 2005) (citing *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000)).

[3]    *J.F.E. v. J.A.S.*, 930 P.2d 409, 411 (Alaska 1996) (citing *Farrell v. Farrell*, 819 P.2d 896, 898 (Alaska 1991)); *see also Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

[4]    *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998) (quoting *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 134 (Alaska 1997)).

[5]    *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002) (quoting *Siekawitch*, 956 P.2d at 449) (internal quotation marks omitted).

[6]    *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)) (internal quotation marks omitted).

to factor six — the "willingness and ability of each parent" — he argues that "[Patty's] move may have been motivated by a desire to frustrate visitation in retaliation against [Mark] for refusing to reconcile their relationship." And he argues that "[Patty's] position that she could not find work in Seward appears to have been merely an excuse she could hang her hat on in order to take the boys and move away." But in his reply brief he argues that the move was illegitimate under a *Moeller-Prokosch*[7] analysis separate from the best interests analysis and that a *Moeller-Prokosch* analysis should be required for all relocations.

The *Moeller-Prokosch* cases dealt with the legitimacy of a move outside of Alaska. In *Moeller I* we held that "a court making a custody determination in cases where one parent chooses to move away from Alaska must do so by determining what custody arrangement is in the best interests of the child under the criteria stated in AS 25.24.150(c), including determining whether there are legitimate reasons for the move."[8] We held that "a proposed move is legitimate if it 'was not primarily motivated by a desire to make visitation . . . more difficult.' "[9] And we noted that "if the court finds that a move is primarily motivated by the desire to frustrate visitation, the court must take this finding into account in its best-interests analysis."[10]

In *Moeller II* we further explained:

We said [in *Moeller I*] that if a move is not legitimately motivated "the court must take this finding into account in its

---

[7]    *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001) (*Moeller I*); *Moeller-Prokosch v. Prokosch*, 53 P.3d 152, 155 (Alaska 2002) (*Moeller II*).

[8]    *Moeller I*, 27 P.3d at 316.

[9]    *Id.* (alteration in original) (quoting *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989)).

[10]    *Id.*

best-interests analysis." We should have added that if a move is found to be for legitimate reasons, the court should not hold the move against the party who proposes to move. The court should not find her to be, because of the move, "selfish and unwilling to promote an open and loving relationship between" the child and the other parent. Legitimately motivated moves are a common feature of "today's mobile society." Such moves would be unfairly deterred if courts were to hold that the moving parent has demonstrated by her desire to move a parental deficiency or weakness.[11]

As Patty asserts, we have never applied the *Moeller-Prokosch* analysis to relocations within Alaska, although recently in *Campbell v. Hanson* we noted:

> [The mother] concedes that our case law does not make clear whether the "full panoply of findings" required under the *Moeller-Prokosch* line of cases is required when a parent relocates in state. We note that most of the cases in which we have ruled that a *Moeller-Prokosch* analysis applies — requiring a symmetrical analysis of the statutory factors "in light of each parent's situation, including relocation" — have involved one parent relocating out of state. We have never required its application when both parents remain in Alaska, their residences are connected by the state road system, they need not travel by air or water, and they live only about three hours driving time apart, as here. We have consequently never held in a case with facts like those now before us that it was an abuse of discretion to fail to apply a *Moeller-Prokosch* analysis. But on the other hand, we have never held in a case factually resembling this one that it was an abuse of discretion to apply a *Moeller-Prokosch* analysis.[12]

The *Moeller-Prokosch* legitimacy concern is to avoid situations where one

---

[11] *Moeller II*, 53 P.3d at 155 (citations omitted).

[12] Mem. Op. & J. No. 1425, 2012 WL 2866090, at *4 (Alaska July 11, 2012) (citations omitted).

parent uses a move to decrease the custodial time of the other parent.[13] We note that a parent changing locations can significantly decrease custodial time whether they move three hours away or ten hours away, as this case amply demonstrates. But we do not need to decide in this case whether a *Moeller-Prokosch* analysis is required in every relocation case — it is enough on the facts of this case to conclude that the superior court did not abuse its discretion by conducting one, especially when Mark expressly contended that Patty's proposed move was illegitimate and designed to lessen his time with the children. Given that the court conducted the *Moeller-Prokosch* analysis that Mark argues should be required, Mark's argument is difficult to fathom.

Here the superior court found the move was legitimate. The court stated that in Seward there were few work opportunities in Patty's field, and that "[a]lthough [Patty's] decision to leave her long-standing job in Seward was short-sighted, it was not motivated to interfere with [Mark's] relationship with the children." Ample evidence in the record supports the superior court's finding that Patty's move was legitimate. There was testimony that in Seward there were no realistically available jobs in Patty's field, and the court found Patty's testimony about the move credible. [Exc. 37, 40-41] Although Mark argues that Patty should take a job in the Alaska Bush so she could stay in Seward part time, the court cannot control where Patty wishes to reside and work.[14]

The court did not clearly err by finding that the move had proper motive. And once a finding of legitimacy was made, the move could have no bearing on the best interests factors regarding each parent's willingness to facilitate the children's

---

[13] *See Moeller I*, 27 P.3d at 316 (holding that move is legitimate if it is "not primarily motivated by a desire to make visitation . . . more difficult" (quoting *House*, 779 P.2d at 1208) (alteration in original)); *McQuade v. McQuade*, 901 P.2d 421, 424 (Alaska 1995) (same).

[14] *Moeller I*, 27 P.3d at 317.

relationship with the other parent.[15]

## B. Custody Modification

There are "nine potentially relevant factors that the court must consider" when determining the best interests of the child,[16] including:

> [1] the needs of the child; [2] each parent's ability and desire to meet those needs; [3] the child's preference, if he or she is old enough to have one; [4] the love and affection between the child and each parent; [5] the stability and continuity of the child's environment; [6] the willingness of each parent to facilitate the child's relationship with the other parent; [7] any domestic violence or child abuse; [8] any substance abuse that directly affects the child; and [9] other factors that the court deems pertinent.[17]

The superior court does not need to mention each factor by name; it is sufficient if the findings provide "a clear indication of the factors [that the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved."[18]

In this case the superior court did mention each factor by name, and it made findings on all of the factors but two — substance abuse and domestic violence — because those two factors were not implicated by the evidence. The court made brief findings on factors three, four, and five because it found that they were neutral: "[The children] are too young to express an opinion . . . that could be given weight"; "the

---

[15] *Moeller II*, 53 P.3d at 155.

[16] *Park v. Park*, 986 P.2d 205, 206 (Alaska 1999).

[17] *Rosenblum v. Perales*, 303 P.3d 500, 504 n.11 (Alaska 2013) (citing AS 25.24.150(c)).

[18] *Id.* (alteration in original) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 648 (Alaska 2005)) (internal quotation marks omitted).

children are bonded to both parents and . . . love and affection exist between each child and each parent"; and "[b]oth parent[s'] homes adequately meet the needs of the children." The court did find that factors two (each parent's ability and desire to meet the children's needs) and six (the willingness of each parent to facilitate the children's relationship with the other parent) weighed in Patty's favor, but it found that factor nine (any other factors the court deems pertinent) weighed in Mark's favor because the children had deep roots in Seward. Mark argues that the court clearly erred in its findings for factors two, five, and six and therefore abused its discretion in weighing the factors.

### 1.     Each parent's ability and desire to meet the children's needs (factor two)

Mark contests the superior court's finding that factor two favored Patty. He mainly argues its finding that "but for the mother, the children would likely miss many doctors, dentist and other appointments" is clearly erroneous. And Mark argues that this factor should favor him because he is "more available for the children." But the superior court's finding is not clearly erroneous.

Patty testified credibly that she was the parent responsible for scheduling the children's activities. Mark testified that he had to have Patty watch the children once because he "screwed up his calendar," and when questioned by counsel for Patty he was not very quick with the names of the children's doctors and teachers. Mark admitted to scheduling a summer camp without checking first with Patty whether it would work, and Mark's girlfriend also testified that he once had not told her what time the children were supposed to be dropped off at Patty's, resulting in them being late. The superior court was not clearly incorrect in its assessment that "[i]t is not that the father is not capable of performing those tasks, he just doesn't do them when he has the opportunity."

## 2. Each parent's willingness to facilitate the children's relationship with the other parent (factor six)

As discussed above, the court did not clearly err by finding that Patty's move had proper motive and eliminating the move as part of the factor six analysis. In making its finding about factor six, the court was troubled by Mark's disparaging comments about Patty. It determined that Patty had been supportive of Mark's relationship with the children, even if she "had her own moments of being self-centered."

The evidence supports the court's finding that factor six favored Patty. Patty testified repeatedly during the proceeding that Mark needed to have ample custodial time, and that if the transition were done in the right way it would be less hard on the boys. Ample evidence also supports the court's finding that Mark "disparaged [Patty] in front of the children and has done so within his family." Mark admitted to one instance, Patty testified credibly to another, and a third party also testified to Mark's disparagement. Mark does not dispute the court's finding that he disparaged Patty, instead arguing that testimony showed an instance when Patty disparaged him. But the court reasonably chose to give less weight to testimony about Patty's alleged disparagement after it found that the witness was not credible. The superior court did not clearly err in finding that Patty was the parent more likely to foster an open relationship with the other parent under factor six.

## 3. Stability and continuity of the children's environment (factor five)

Mark addresses this factor primarily in his discussion of the nature of the move to Anchorage. But he argues, as a whole, that the superior court should have found factor five weighed in his favor because keeping the children in Seward would provide geographical stability. And he argues that it was inconsistent to find, in factor nine, that staying in Seward would be in the children's best interests, but not find that factor five

favored him as well. But factor five measures more than just geographical continuity.

"The court, in its stability analysis, may consider circumstances affecting the child's geographic[al], emotional, and relational environment."[19] The court considers geographical stability in this factor,[20] but "[a] continuity test centered entirely on the child's geographical stability would always favor placing the child with the non-moving parent. Yet [we have held] that courts may properly award primary custody to the relocating parent when that parent offers superior emotional stability."[21] Thus, we have held that "the continuity and stability factor does not preordain the result in such cases; instead, it commands a comprehensive inquiry into 'each parent's respective ability to maintain stable and satisfactory relations between themselves and the child.' "[22] To maintain emotional continuity the court also may consider which parent is the children's primary caregiver.[23]

In a similar case, *Meier v. Cloud*, the mother wished to move the child from Eagle River to Seattle.[24] As here, the court found that both parents could provide a stable

---

[19]     *Houston v. Wolpert*, 332 P.3d 1279, 1283 (Alaska 2014).

[20]     *Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001) ("Because the child will no longer be able to spend equal time with each parent in these situations, a court considering the child's need for continuity and stability in this context must examine not only the desirability of maintaining geographical continuity, but also the importance of maximizing relational stability.").

[21]     *Id.* at 1279.

[22]     *Id.* (quoting *McQuade v. McQuade*, 901 P.2d 421, 426 (Alaska 1995)).

[23]     *Houston*, 332 P.3d at 1284.

[24]     34 P.3d at 1275.

and loving environment for the child.[25] But the court found that as the primary caregiver, the mother would be slightly better placed to provide a stable environment.[26] We upheld that decision, noting the "close balance of [the] statutory factors."[27]

The evidence supports the finding that both parents can provide the children with a stable, loving environment. There would be more geographical continuity if the boys stayed in Seward, but as noted in *Houston v. Wolpert*, geographical continuity is only one aspect of the stability factor,[28] and the court accounted for geographical stability in factor nine. The superior court did not clearly err in finding that factor five was neutral.

### 4. Custody decision

In light of: (1) our conclusion that the superior court's factual findings are not clearly erroneous; (2) the superior court's complete analysis of all the relevant custody factors; and (3) the broad discretion we confer on the superior court to fashion a custody framework, in this very close case where both parents clearly love their children and are more than adequate parents, we cannot say the superior court abused its discretion in allowing the children to move with Patty.

## V. CONCLUSION

We AFFIRM the superior court in all respects.

---

[25] *Id.* at 1279.

[26] *Id.*

[27] *Id.*

[28] 332 P.3d at 1284.